The next party on our calendar is United States of America v. Lawrence Hoskins, and I believe those parties are in the courtroom. Thank you. Counsel, we have an appeal and a cross appeal. Yes, Your Honor. Are you going to argue first as the appellant and then on the cross appeal as well? Yes, Your Honor.  Thank you, Your Honor. In the case of court, my name is David Novick. This is a U.S. attorney in Connecticut, and I represent the government in this matter. Your Honors, a proven agency is a fact-driven inquiry that is best led through a properly destructive jury entitled to draw all reasonable inferences from the proven facts. And that's what should happen in this case. Here, the defense is not claiming that there is any problem with instruction on agencies given to the jury. And so this is simply a sufficiency of the evidence claim. Here, Your Honors, there was more than sufficient evidence from which the jury could find that Mr. Hoskins acted as an agent of Austin Power Inc., an API, a U.S. company, in obtaining the Terrier project, and especially an assistant API in finding and retaining bribe-paying consultants. Let me just go back. You don't think that the district court didn't have the power to do what she did, do you? I mean, she had the right and the discretion to not accept the jury verdict based on her understanding of the evidence, did she not? Your Honors, certainly under Rule 29, the court could decide to grant a motion for acquittal, and then this court would abuse that determination. There's no abuse of discretion standard here. It would be this court approaching this on Rule 29 from fresh. Correct. Proceed. Thank you. The government's point here is that there was no claim that the district court misinstructed here. This is simply a sufficiency of the evidence claim, and now this court is considering the bill. Your Honors, as I said, there was more than sufficient evidence from which a jury could have found and did find agency of Mr. Hoskins, and particularly that API, Austin Power Inc., had the right to control Mr. Hoskins' activities on its behalf. Three critical sets of facts lead to that conclusion. Number one, in the early part of his involvement with Farraghan, Hoskins had to repeatedly seek API's approval before working with the bribe-paying consultant, and even had that approval withdrawn after initially deciding who the consultant was going to be in favor of someone else, and that's roughly in pages 860 to 866 of the government's appendix. Second, in September 2003, in a meeting in Jakarta, Mr. Hoskins implemented a change in consultant arrangements at API's direction and under API's control, changing the arrangements, again, under API's direction and control, showing, again, that sufficient evidence of control and abatement. Third, in the course of negotiating a fee schedule with that new consultant, Mr. Hoskins continuously had to check back— Well, when you say, with respect to the second— Yes, Your Honor. Under API's control, was it—what exactly was under API's control? Sure, Your Honor. The decision that Mr. Hoskins was communicating to Mr. Cherokee and Mr. Alia was a decision that was under API's control, and Mr. Hoskins then communicating that to those two individuals was under API's control. In other words, Mr. Hoskins did not have the power, the authority, to give that instruction absent approval and direction from API. And, in fact, if you look at the several emails— Did API, with respect to this part, have the ability to eliminate Mr. Hoskins' role altogether from this decision-making part? From that situation, Your Honor? Yes. Presumably, they could have done it themselves. Well, I'm asking about evidence. Is there evidence in that? There is evidence that it was the emails directly preceding the time in which this meeting happened, roughly August-September 2003, show API—show emails back and forth between Mr. Hoskins and other folks at API and within Alston, indicating the failure of Mr. Cherokee, the existing consultant, to execute the responsibilities he had and the need to change consultants, but in several instances reiterated the point that that decision could not be executed until the approval was given by API. In other words, it was API with Alston Windsor that had to make that decision. There's emails that talk about how it had to wait for the coming of the decision-maker, and there's testimony talking about how that was going to be—had to be Mr. Cherokee in this particular instance. There's testimony from Mr. Puckett, testimony from Mr. Rothschild, all that that decision was one that had to be made by API. So, Your Honor, the jury could infer from those facts—in other words, from the emails prior to that September 2003 meeting and from the fact that Mr. Cherokee and Mr. Hoskins were at the meeting in September of 2003—Mr. Thiessen explained that—that all of the elements of agency were met there. There was an agreement. They were both sitting at that table. Mr. Hoskins communicated a decision made by API, and the jury could infer that was done not in the decision, not the instruction of API. So this is an interim instruction theory of agency? Your Honor, it is very much an interim instruction in the sense that—but I would argue here, Your Honor, that this case is unlike Fislein. There's not that—we're not looking to determine who has a fiduciary relationship with somebody else. There's no—in Fislein, the issue was there was no time lapse between the initial creation of the relationship and the execution of the task. Here, there's two years of sort of constant interim instructions being given. First, at the beginning of the project, when they're changing who the consultant is going to be initially from, I believe, Mr. Harsono to Mr. Cherokee. Then in that September 2003 meeting, when it's being changed from Mr. Cherokee to, well, adding on a second consultant. And then, Your Honor, to get to my third point, third piece of evidence here, interim instructions related to negotiating a fee schedule with a new consultant. Mr. Ali and Mr. Hoskins continuously had to check back with API and with Mr. Cherokee to make sure that they approved before he could negotiate on Austin Power Inc.'s behalf. And that's roughly in pages 934 and 937 of the government's appendix, emails, where Mr. Hoskins is looking for approval to assert a particular—or go and try to negotiate a particular fee schedule on API's behalf to ramp up or accelerate the fees in order to pay the consultants who might pay the product more quickly. And, Your Honors, the common thread throughout all of these is that interim instructions are just constant instructions, a constant need to check for approval with API before Mr. Hoskins could do anything on their behalf. And from that, there was more than sufficient evidence for the jury to conclude that there was sufficient control here to engage. Mr. Corr may have disagreed with the conclusion, but the jury was entitled to make those inferences to have those conclusions. It's a subtle difference, but isn't there a difference between a right to control and de facto control? I think what you're describing, at least with two of these three items, is de facto control. Your Honor, there is a difference. I think what one can— And are we focused on the right to control? We are, Your Honor. I think what I'm suggesting here, Your Honor, is that one can confer the right to control from actually what happened to you. In other words, they repeated in testimony from the witnesses, for example, Mr. Puckett, saying, as a practical matter, on Clarehand, Mr. Hoskins reported to Mr. Carucci. It was sort of the way the agency, the court has considered the agency, is in those practical terms, is in what actually happened, not looking at sort of form over function. How did this project actually take place? And I think, Your Honor, one can glean from the—what happened on the ground here, evidence that Mr. Hoskins—that API had the right to control Mr. Hoskins because, in fact, they did, repeatedly. Mr. Hoskins would not move forward without approval from the FBI. And could you—I'm sorry, but can you repeat again, but maybe you haven't said it yet, what evidence there was that API had the power to terminate Mr. Hoskins' authority to participate in the hiring of consultants? The government's argument here is that the fact that Mr. Hoskins' involvement here was only at the request of API, and so— But he was at a different chain of command than API, wasn't he? Yes, Your Honor, absolutely. He only gets involved in this project because API asked. If API didn't want to hire a consultant, Mr. Hoskins would never have been involved in this project. It was—and all the sort of corporate process documents echo that, talking about how the international network of which Mr. Hoskins was a member only gets involved when requested to support the sales, support the business in trying to run a project. And API could not fire Hoskins, isn't that correct? Certainly, Your Honor. They could not hire. They could not fire. But again, this wasn't an employee-to-employee relationship. If that was the case, if agent—if that was required, then there would be no difference between employee or employee, if agent is— Correct. Your Honor, all of that evidence, those three points that I just made, are consistent with some of the other evidence that the jury saw the jury could have inferred control from. For example, evidence that Mr. Hoskins—excuse me, that API controlled the Tarihan project itself. In other words, the jury could have gleaned that if Mr. Hoskins is doing actions on behalf of API on the Tarihan project, and API controls all of the exigents on the Tarihan project, the jury could infer that they also controlled Hoskins' actions in furtherance. You know, one of the things that I think we usually consider in determining whether there's an agency relationship is the existence of a fiduciary obligation, right? Yes. You haven't mentioned that. You haven't referenced that. What evidence was there that the actors involved, Mr. Hoskins and the people at API, all the where Mr. Hoskins owed a fiduciary obligation to API? So what's interesting about this case, Your Honor, is typically, as Your Honor said, we are looking at a defined agency in order to determine whether there was a fiduciary relationship in order to determine whether the agent—for instance, they're responsible for what the agent had done. Right. That's not an issue here. We're really looking just at the agency relationship. That's really what it's kind of a square peg, round hole analysis of what agency is and what the import of agency is. I would argue, Your Honor— Well, we're past that. Yes, Your Honor. And what I would argue is that there was certainly no question that Mr. Hoskins, as an employee of international network, the evidence is pretty clear that his responsibility once requested was to support the business units. I mean, he was clearly a fiduciary of Halston Power, Inc. He had the obligation to work on behalf of them and in their best interest to try to win this project. But again, that's not really an issue in this case because there's nothing flowing from the decision that he is or he is not a fiduciary. Counsel, your time has expired. You're reserved two minutes for rebuttal. Would you like to use that now? I'm here, Your Honor. Thank you very much. Okay. We'll hear from Hoskins. Also, there's a cross-appeal. So, I hope you get a chance to speak both to your direct appeal and your cross-appeal. Thank you very much, Your Honor. My partner, Ken Silver, is going to address the affirmative appeal, and I'm going to address the response to Review 25. Okay. Proceed. Thank you very much. Good morning. May it please the Court, my name is Chris Morvillo. And along with my partner, Dan Silver, I have the privilege of representing Mr. Hoskins on this appeal. Mr. Silver and I also represented Mr. Hoskins in proceedings in the District Court. One update for the record. Mr. Hoskins, who remained on bail in the U.S. until he was able to receive his COVID vaccine, surrendered his 15-month sentence in April and is currently serving his sentence. Judge Barberson's Rule 29 decision below was correct and should be reaffirmed. As this Court knows from its earlier decision in this case, the question of agency has been a part of this case since the outset and was subject to much litigation in a variety of contexts, pretty much from day one. As a result... That's because the statute doesn't define it. That's correct. It was intentionally vague. It is a question that was, as I said, subject to much litigation in the District Court. But the parties agreed, as I understand it, that the common law definition of agency, as aided by the restatement, for example, on agency, was the operative definition. That is correct. We, from the beginning, for a variety of reasons, determined that that was the appropriate definition to use in this case. Although, as you will have seen from the initial briefs, there is perhaps an hour meaning that term is used in the SCA. Yes. But Judge Overton, because of the history of the litigation in this case, was acutely attuned to the question, having presided both over the trial and the pre-trial litigation. So it's no surprise that Judge Overton's carefully reasoned opinion hit the nail squarely on the head in concluding that the government introduced no evidence from which a reasonable jury could infer an agency relationship between Mr. Hoskins and the U.S. and its concerned issues here in the FBI. So the government outlined three areas or pieces of evidence that it says a reasonable jury could have latched onto to infer an agency relationship between Mr. Hoskins and API. Could you just address those three? Sure. So the government argues that because Mr. Hoskins followed requests from API, that the jury could have inferred that he was under their control. The government argues that because the Carrier project was under the control of API, the jury could have inferred control from that, and because Mr. Hoskins was in a support position in the international network, they could infer control from those three points. But all three of those points, independently and collectively, are insufficient. There's, at the outset, worth noting that none of the government's witnesses, nor any document, expressly proved an agency relationship. Well, that's why we have the word infer. So is there any, what's wrong with the first bit of evidence? I mean, in other words, why couldn't a jury infer from that, and as you put it, it's either individually or collectively with respect to all three, but infer from that, that there was an agency relationship? Well, first, the evidence showed conclusively that API could not fire Mr. Hoskins, could not reassign him, could not denote him, or could not affect his compensation. What agency relationship exists when the principal cannot do any of those three things? Is there a way to view the agency relationship as limited to a particular decision-making process? In other words, to view it as limited to just the decision-making process as it relates to getting consultants for this Tarrahan project? Tarrahan project? Yes. So you exclude Mr. Hoskins? Correct. So an agency doesn't have to be an agent for everything, and you may not be able to terminate him or her for everything, but you can terminate their role in the decision-making process over which the principal has authority. That is theoretically possible, but not on the fact that this case— Okay, tell me why not. Part of Mr. Hoskins' job at the International Network was to assist with the selection of and the negotiation with third-party consultants in his region. His job was a headquarter job, to sit in headquarters in Paris and participate in the, among other things, the selection and negotiation with and approval of third-party consultants in his region. And the evidence makes clear that that was his role. I would point the Court's attention to page 783 of the Defense Index, which makes clear that Mr. Hoskins' role, part of his role for International Network, was to contribute to the selection of agents in his region. Similarly, page 978 of the Governance Index makes clear that another part of his job, and his role as an area senior vice president at International Network, was to negotiate with consultants. In other words, Mr. Hoskins' authority carried out the job responsibilities to help select and negotiate with consultants, derived from his position at International Network, and not in any way, shape, or form from his relationship with Paul Snow Power, because there's no— there's absolutely no evidence in the record that demonstrates otherwise. But there's still more. Another part of Mr. Hoskins' job at International Network was to approve the key terms of any resulting consultancy agreement. The evidence demonstrated that Alston Power Bank couldn't hire any consultants without Mr. Hoskins' and International Network's approval—headquarters' approval. Similarly, the evidence showed that Alston Power Bank could not overrule Mr. Hoskins' decisions with respect to that approval requirement. In fact, although—so there was some testimony, I'm trying to remember from who, that API had the ultimate decision-making authority over hiring the consultant. So that's where this is a bit confusing in your eye. Hold on, hold on. 949? Yes. Okay. All right. This list is the selection and approval process for agents. And so what happens at Alston, which, of course, was a company with 120,000 employees around  And it decided that it needed to hire or wanted to hire a consultant. They would initiate that process. They would begin and say, hey, this is something that we really want to do for this project. And there are a number of steps that have to be performed along the way, involving and including the negotiation and agreement to what the terms that they might accept as a business agreement. But at the end of the day, Mr. Hoskins, whose authority appears in step nine here, if you want compliance, International Network enters the application into the International Network approval process. And that's where Mr. Hoskins' approval authority comes in, at the end of the process. So, yes, ultimately— There's a question. I'm sorry. Can I hear that? There's a—the beginning of the process is where the sector, the OPI in this case, introduces the idea that they want an agent and they want—and what terms they're going to accept. Once that process, once that decision is made, then Mr. Hoskins, as a representative of headquarters in Paris, has approval authority for whether those terms and conditions are sufficient for the hiring of a particular consultant. But there was—I'm sorry, go ahead. Here's what I wanted to ask you. Is your position that agency is an element of this offense that has to be proven beyond—that a reasonable jury could find proven beyond a reasonable doubt, or is it some sort of a subsidiary fact, subsidiary to one or more of the elements of the crime? Your Honor, as this Court's decision about three years ago made clear, agency is an essential element of the extramarital violations charge here. And so they have to prove agency beyond a reasonable doubt. And here, our position is that none of the evidence in this case so far demonstrated that there was control over Mr. Hoskins by API, either fleeting or entirely, because he worked for a completely different arm of the company. Or did Mr. Hoskins ever agree to act as an agent on behalf of Alston Power?  Thank you, Your Honor. Can we hear from Mr. Silver on the cross-appeal, I'm assuming? Yes, thank you, Your Honor. This is Daniel Silver for Mr. Hoskins. If I could, Your Honor, reserve one minute for rebuttal on the affirmative appeal after the government has proceeded. Sure. Thank you. To begin with the withdrawal instruction below. The withdrawal instruction that Judge Argent gave was erroneous for three reasons. First, Judge Argent failed to include the language from this Court's position in Berber, which sets forth the standard by which someone who is participating in a conspiracy through a business may effectually withdraw. That's the first error. Second, that was compounded by the fact that Judge Argent gave certain examples of withdrawal, but unlimited examples, that were only demonstrative of actions taken to defeat the object of a conspiracy rather than disavow. And as this Court has said on numerous occasions, the withdrawal could be disavowal or taking action to defeat the object of a conspiracy. And then lastly, the district court gave what's referred to as the ticking time bomb instruction from Borrelli, which on these facts was simply not supported. So I can expand briefly on those three points. First, with respect to the Berber test, Berber says very clearly that in the context of a business through which a conspiracy operates, if a defendant demonstrates that he or she openly severed ties with the alleged co-conspirators, performed no further acts in furtherance of the conspiracy, and, three, received no further benefit from the conspiracy, that may effectuate a withdrawal. So you're dating Hoskins' withdrawal from the time he resigned from API or from Alstom? Yes, absolutely. He resigned in August of 2004, and so our argument below was that that effectuated his withdrawal from the conspiracy. And the operative date for the statute of limitations here was September 2005, due to when the government filed various headlines. So the jury accepted that his resignation in 2004 constituted withdrawal. So what you want is, unlike Berger, which involved, as I understand it, a totally sham business, what you want is a rule of securities fraud pursuant to which someone who is charged with conspiracy to commit securities fraud can just withdraw by resigning from a legitimate business. So I am involved in—I'm a managing director of large company XJP Morgan, and I'm involved in a large-scale conspiracy, and just resigning and stepping away is enough. Well, I think that— Is that a yes? Yes or no? Yes. That's a yes to me. Okay. Have we ever said that? Because that is not Berger. Well, I think—let me just finish my answer, Your Honor. I think it's a yes if the three elements set forth in Berger are satisfied. So, you know, withdrawal—resignation under those circumstances would not be withdrawal as a matter of law, but if those three factors mean your court conspirators are identified that you're leaving, you receive no further benefit, you take no further action to participate in a conspiracy. If those factors—the jury should have any discretion to determine that those factors are— So I email all of the other co-conspirators at JPMorgan, and everybody else, I'm leaving. I step aside. I'm no longer—I'm paid by JPMorgan, and that's enough? You renounce any further claim to additional benefit. Well, sure. I'm not getting paid by JPMorgan anymore. That's enough. That cannot be. That is not a sufficient disavowal. The jury— We've required an affirmative disavowal. Is that right? Yes. There has to be an affirmative disavowal. And our argument is not that resignation constitutes disavowal as a matter of law. But what our argument is, as Berger states, that those factors can constitute disavowal. The jury should have the discretion to find, based on the specific facts and circumstances, that those factors—no further benefit, no final co-conspirators— So this is a factual dispute that the jury did decide. Well, but the jury was not given that test, Your Honor. The jury was not given that test. The jury was not given—in fact, they were given limiting examples that undermine that test. You wanted the Berger test. You wanted a precise— A Berger test. And just on this point of criminal enterprise versus normal J.P. Morgan business, the Berger test is taken from a Third Circuit case called Pantar, which involved a legitimate business. It was an electronics retailer through which the executives were out for perpetrating a securities fraud. So it actually comes from a securities fraud case, not a large organization like J.P. Morgan, but nonetheless a listed company through which the crimes were— But you acknowledge that what you're asking is a slight step beyond Berger, at least with respect to our own jurisprudence in the Second Circuit. Well, I'm not sure I would concede that we're asking, frankly, really beyond Berger. I think what we're asking for is the jury to actually inform that the Berger elements are relevant to evaluating whether there was an affirmative disavowal in this context. Very briefly, I will just move to the speedy trial claim, Your Honor. And I think that the key issue there is the September 2008 status conference. Judge Arberton retroactively concluded that there was an ends of justice finding exclusion of time at that conference. But the record itself from that conference is bereft of any actual balancing of the ends of justice factors or any findings. And I think it's clear from this court's jurisprudence that we must be guided by a contemporary case record and cannot solely rely on a non-protonic subject. And so if you look at that status conference— Did you raise that issue with Judge Arberton sometime after that date? We did, Your Honor. We moved to dismiss on speedy trial grounds the following summer, I believe in July. And then after our motion to dismiss was filed, Judge Arberton then issued a brief non-protonic order retroactively excluding time. And I would just note for the record that at that status conference, Mr. Huffman was not present and there was no waiver of time filed as there had been in every previous exclusion of time prior to that. Thank you. Thank you, Your Honor. Mr. Novick, you have reserved three minutes for rebuttal. Thank you, Your Honor. Your Honor, just to briefly address the murder issue, as a special matter, Mr. Hoskins did not meet the standards set out in the murder. He never even resigned from the conspiracy. There was no affirmative act to disavow the conspiracy. It wasn't enough that he resigned from Alstom?  That were the rules, Your Honor. It would set the bar so much lower in a white-collar case operated through legitimate business. And all you have to do is send your farewell email and you're out of the conspiracy for purposes of further criminal liability. You have to do something to actually communicate a disavow or defeating or an attempt to disavow or defeat the purpose of the conspiracy. Judge Argerton correctly found, just as the court was suggesting, that the resignation from a legitimate business is not the same as the resignation from a purely criminal enterprise, and that the proper instruction of one has erred the resignation to enact a disavow or defeat the conspiracy, which is how she instructed it. I mean, I just don't see how you draw the line. If it's just a resignation from a legitimate business, that's very difficult. I agree. So I'm going to move on to address in response to counsel's point in regards to the direct appeal. Your Honor, the issue here is the issue of agency and whether the test of agency was met properly, given the test of agency, the instruction of agency was met, was probably contested on both sides of the line. All of the arguments that Your Honors see here and see in the briefs were clearly articulated. So Mr. Mordillo says, and he cited to a number of different pages, 783, 978, 949, and so on, that it was part of Mr. Haskins's job to sit and select their party consultants. But his job at Alston, not at API. Right. So Mr. Haskins had several different functions. One of his functions, as we talked about in the briefing, was an approval function. And there are corporate process documents. By the way, the document that Mr. Mordillo pointed you to doesn't even apply to the power business. It's the power service sector. We're not disputing that. It's pretty similar across the board. But that's an indicator of why those corporate process documents aren't actually useful when you're trying to think about how things are actually operating on their end. This was a case in which the testimony showed that those corporate process documents didn't mean a whole lot. Well, I understand. There was, on the defense side, a resort to organizational charts. On your side, you're trying to— And those kind of missed questions of law and fact, like materiality and the world of securities fraud, are properly left— As far as you can be found, properly left to a well-instructed, properly instructed jury. And that's what should have happened to your guard. Thank you. Counsel, one question. On this appeal, do we owe any deference at all to the district court's determination that the evidence did not permit a reasonable jury to find guilt beyond a reasonable doubt? No, Your Honor. Not at all. Obviously, the district court is a very limited court, but the analysis here is entirely de novo. The standard here is entirely de novo on Rule 29. Even on Rule 33, absent some—this Court recently found in Archer— absent some typical impossibility or clear credibility problem that the court can't— even the district court can't just re-weigh the evidence. And no deference is due to the court in that regard either. This is entirely de novo for this Court. And there was a question posed, I think, by Judge Newman about the reasonable doubt standard with respect to this particular agency. Do you agree with Mr. Morvello? I agree that agency had to be proven beyond a reasonable doubt. And I think that a reasonable jury here could have found that based on the evidence, drawing all reasonable inferences from the evidence. Thank you. Thank you all. We'll reserve decision. We'll argue. I had a minute here. Oh, yes. You had a minute. Forgive me. Thank you. I'll just return briefly to the withdrawal instructions and to note that we have identified an initial error in the instructions. We know this Court concludes that the verbal language was not appropriate. We also object to below and raise on appeal a challenge to the ticking time bomb instruction, where Judge Larson essentially said that the jury would have to find that Mr. Hoskins had taken some affirmative steps to defuse the foreseeable consequences of his own conduct. And I think that chart was inappropriate here because there was no ticking time bomb to be defused. You know, Mr. Hoskins, according to the government's allegations, had taken certain steps to facilitate the hiring of consultants. But the ultimate crime of bribery, there were numerous contingencies that had to occur that required the participation of other focus theaters before any actual bribery could be constituted. So no payments were actually made until the actual contract had been finalized. The Indonesian government began to pay API for services. Mr. Silva, this may not be your area, but I do have a question because I was taken aback by a footnote, I believe, in the government's brief about the OECD. Considering whether or not the original Hoskins decision put the United States, the government, in a position where it might not be in compliance with the OECD convention, are you aware of what the status of that is and if that's a real issue? I'm not aware of the status of that. I don't believe Mr. Corbello is either. I was also surprised by that footnote and have no knowledge of it actually. And is the government? Maybe Mr. Khan or somebody? I'll allow Mr. Khan to speak to this more directly. I'm aware of the time. This is unrelated to the withdrawal. I just... Good morning, Your Honor. Thank you. The status of that is that the OECD issued a report with recommendations, and one of the follow-up recommendations is that they would follow the ongoing status of what courts across the country are doing in this regard. And I believe they've found that the Second Circuit's decision may call into question whether or not we are in compliance with our treaty obligations. As a result, they're waiting to see if this issue gets taken up by other courts above, that the issue is resolved. Other courts, meaning other circuit courts and the Supreme Court? Correct, Your Honor. Thank you. Thank you. Thank you all very much. As I said, well-argued, the reserved decision.